USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 15, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

SKENDER CAKONI,                                  :
                                                 :
                              Petitioner.        :
                                                 :            14-cv-2290 (KBF)
              -v-                                 :            10-cr-464-7 (KBF)
                                                 :
UNITED STATES OF AMERICA,                        :            OPINION & ORDER
                                                 :
                              Respondent.        :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

        Petitioner Skender Cakoni seeks to vacate, set aside, or correct his conviction and sentencing on drug conspiracy and firearm charges following a jury trial on June 23, 2011.  On April 13, 2012, this Court sentenced Cakoni to a term of 200 months' incarceration, to be followed by eight years of supervised release.[1]  Cakoni appealed his conviction and sentencing, which the Second Circuit affirmed on August 22, 2013.  United States v. Sejdaris, 534 Fed. App'x 23, 25 (2d Cir. 2013). On March 21, 2014, Cakoni filed the § 2255 habeas petition now before the Court. (ECF No. 1 ("Pet.").)[2]

        In his moving papers, most of which are devoted to summarizing the course of the earlier proceedings in this matter, Cakoni essentially argues that all the lawyers who represented him were ineffective at all of the stages of the proceedings below on account of basically all of the discretionary decisions they made. According to Cakoni, if only his counsel had been effective, he would have been

---

[1] The Court also imposes a $200 mandatory special assessment.

[2] Unless otherwise noted, all citations in parentheses refer to the civil docket in this action, no. 14-cv-2290.

acquitted, or would have been given a lower sentence, or would have won a point on appeal to the Second Circuit. In other words, Cakoni's § 2255 petition is an attempt to take a second bite at the apple regarding nearly every issue that has been litigated or negotiated in this case. While the Court recognizes that Mr. Cakoni has been eminently respectful to the Court, and that he has worked diligently on his petition, it is wholly without merit, and for the reasons that follow it must be DENIED in its entirety.

I.     BACKGROUND

    A.     <u>Trial</u>

At Cakoni's trial, which was presided over by Judge Holwell, the Government introduced evidence that from at least 2003 to 2007, Cakoni and his co-defendant, Plaurent Cela, were members of a large-scale Albanian marijuana trafficking organization headed by Parid Gjoka (the "Gjoka Crew"). The Government's proof at trial included the testimony of Gjoka, one of Gjoka's assistants, a member of the rival Krasniqi Organization, with which the Gjoka Crew had a violent feud, and various law enforcement officers. The Government also introduced evidence of trips to and from Canada by Gjoka Crew members, Western Union records documenting money transfers to drug suppliers in Canada, and phone records of calls amongst Gjoka Crew members and co-conspirators.

Cakoni's counsel at trial was Winston Lee, who has submitted a declaration. (Attorney's Declaration, 10-cr-464 ECF No. 454 ex. A ("Lee Decl.").) Lee's theory of the case was simple and straightforward: Cakoni was not a member of the Gjoka Crew, and the witnesses against him were lying. Cakoni's defense consisted

primarily of cross-examination, particularly of Gjoka, who testified as a cooperating witness. Both the Government's and the defense's examination of Gjoka was extensive and thorough: in total, the parties' examination of Gjoka comprises over 600 pages of the trial transcript. (See Tr.[3] 370-449, 469-662, 668-701, 712-925, 939-1030.) The jury returned guilty verdicts on both counts against both Cakoni and Cela (Tr. 1753-54.)

    B.    <u>Sentencing</u>

Following Cakoni's trial, Judge Holwell left the federal bench, and this case was reassigned to the undersigned. (10-cr-464 ECF No. 352.) At the beginning of Cakoni's sentencing proceeding, the Court indicated that it was considering an upward variance from the statutory minimum of 180 months' incarceration. (Sentencing Tr. 6.) The Court stated that in making its sentencing determination it was required by 18 U.S.C. § 3553(a) to consider the "history and characteristics of this particular defendant." (Sentencing Tr. 9.) Among these characteristics was the "possibility of recidivism," to which it noted that a defendant's expression of "remorse" is relevant. (Sentencing Tr. 11-12.) The Court further noted that in considering whether Cakoni expressed remorse, it was mindful that Cakoni might reasonably have avoided making admissions of guilt during the sentencing proceeding to preserve points on appeal. (See Sentencing Tr. 12.)

After statements by counsel, Cakoni was given the opportunity to address the Court, which he did at length, despite some attempts by his counsel to convey to

---

[3] The Court's citations to "Tr." refer to the trial transcript, and "Sentencing Tr." to the sentencing transcript.

him that doing so was not in his best interest.  (See Sentencing Tr. 16-44.)  Cakoni

claimed, inter alia, that he was "innocent of all these charges," and that he "lost the

trial because [he] was an Albanian." (Sentencing Tr. 27.)  He also stated to the

Court that every witness against him, including law enforcement witnesses, had

lied, and that he "never in [his] life . . . bought, sold or even used marijuana."

(Sentencing Tr. 40.)  Cakoni's statement proceeded for over an hour and 28 pages of

transcript.  (See Sentencing Tr. 16-44.)  It was filled with his theory of innocence.

In its remarks, the Court stated directly that it did not find Mr. Cakoni's

statements credible.  The Court listed the various factors that it took into account in

determining an appropriate sentence, which included: (1) Cakoni's role as an

enforcer of a violent drug-trafficking organization; (2) the harm from drug addiction

and violence that resulted from Cakoni's involvement in drug trafficking; (3) the

mortal danger posed by Cakoni's and his co-conspirators' use of firearms; (4)

Cakoni's prior incarceration for a drug crime; and (5) Cakoni's lack of remorse.

(Sentencing Tr. 45-50.)  As to this last point, the Court stated:

> It is important to this Court . . . that you still do not take
> any responsibility for the crimes for which you have been
> convicted. That, in fact, you pick on small pieces of
> inconsistencies to try to suggest that there is a
> widespread conspiracy to somehow put you in prison.
> This suggests . . . that society would be at risk of repeated
> criminal behavior from [you] . . . if you were released. It
> suggests that you don't understand the magnitude of
> what you have done, that in the face of truly
> overwhelming evidence of your guilt, you still believe that
> you can credibly say that you were innocent. Not taking
> responsibility for this crime and with the statements that
> you have made suggests personal character traits that
> can lead to recidivism and a continued danger to society.

4

(Sentencing Tr. 50.)  The Court also noted Cakoni's positive characteristics, including his strong family and personal relationships, his intelligence, and his talents.  (Sentencing Tr. 49-50.)  After considering all of these factors, the Court sentenced Cakoni to 200 months' imprisonment.  (Sentencing Tr. 53.)

C.    Appeal

Cakoni submitted two briefs on appeal: one written by his appellate counsel, and one he wrote himself.  The counseled brief raises three points.  (See United States v. Krasniqi (Cakoni), No. 12-1888 (2d Cir.), ECF No. 68 ("Counseled App. Br.").)  First, it argues that the Court violated Cakoni's Fifth Amendment rights when it interpreted Cakoni's insistence that he was innocent during his sentencing proceeding as a lack of remorse, and then considered this as a relevant factor in determining Cakoni's sentence.  (Counseled App. Br. at 43-55.)  Second, it argues that this Court failed to follow the appropriate procedures in imposing an enhanced sentence as a result of Cakoni's prior felony drug offense.  (See Counseled App. Br. at 55-61.)  Third, it argued that the Court abused its discretion in permitting testimony about uncharged offenses, such as, inter alia, testimony that Cakoni loaned his car to Gjoka so that Gjoka could drive to Michigan to pick up a marijuana shipment.  (Counseled App. Br. at 62-68.)

Cakoni's pro se appellate brief (United States v. Krasniqi (Cakoni), No. 12-186 (2d Cir.), ECF No. 171 ("Pro Se App. Br.")) raised two additional points.  First, Cakoni argued that the Government constructively amended the indictment by presenting evidence of Cakoni's carrying or possession of a firearm at times other

than the time period alleged in the firearm count, or alternatively presented the jury with a prejudicial variance because a single marijuana distribution conspiracy was charged while the evidence at trial demonstrated two separate conspiracies. (Pro Se App. Br. at 35-40.)  Second, Cakoni argued that the Government engaged in multiple acts of prosecutorial misconduct, including making various unethical statements, violating a Rule 404(b) ruling, and eliciting perjury.  (Pro Se App. Br. at 41-52.)

The Second Circuit rejected Cakoni's appeal in its entirety in a summary order, specifically noting that it had considered all of the arguments raised by Cakoni and his appellate counsel.  Sejdaris, 534 Fed. App'x at 24-25.

## II.   LEGAL STANDARDS

### A.   Bar on Raising Issues That Were Raised Or Could Have Been Raised on Direct Appeal

"[A] Section 2255 petitioner may not relitigate questions which were raised and considered on direct appeal."  Yick Man Mui v. United States, 614 F.3d 50, 55 (2d Cir. 2010) (internal quotation marks omitted).  "This rule may not apply, however, where an intervening change in the law has taken place or 'where the issues were not raised at all on direct appeal due to ineffective assistance of counsel.'"  Underwood v. United States, 15 F.3d 16, 18 (2d Cir. 1993) (quoting Barton v. United States, 791 F.2d 265, 267 (2d Cir. 1986) (per curiam)).

"In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal."  United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011).  "An exception applies, however, if the

defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." Id.  Ineffective assistance of counsel is cause for a procedural default.  See Sapia v. United States, 433 F.3d 212, 217-18 (2d Cir. 2005); see also Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007) ("The rule does not generally apply to claims of ineffective assistance of counsel.").

     B.     Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) his or her counsel's performance "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and (2) he or she was prejudiced by counsel's deficient performance such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington. 466 U.S. 668, 687-88, 694 (1984).  "This two-prong test applies to the evaluation of appellate counsel as well as trial counsel."  Clark v. Stinson, 214 F.3d 315, 321 (2d Cir. 2000).

As to the first prong of Strickland, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel.  Id. at 688-89.  As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way."  United States v.

<u>Aguirre</u>, 912 F.2d 555, 560 (2d Cir. 1990) (alterations and internal quotation marks omitted) (quoting <u>Strickland</u>, 466 U.S. at 689).

As to the second prong of <u>Strickland</u>, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the result would have been different.  <u>Strickland</u>, 466 U.S. at 694.  More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." <u>Id.</u> at 693.

C.    <u>Sentencing</u>

It is "well-settled" that "a district court is <u>required</u> to sentence a convicted defendant based in part on his or her 'history and personal characteristics.'" <u>United States v. Stewart</u>, 686 F.3d 156, 166 (2d Cir. 2012) (emphasis in original) (quoting <u>United States v. Perez-Frias</u>, 636 F.3d 39, 43 (2d Cir. 2011)).  Accordingly, a district court may take into account a defendant's lack of remorse when making its sentencing decision.  <u>See, e.g.</u>, <u>United States v. Martinucci</u>, 561 F.3d 533, 535 (2d Cir. 2009); <u>United States v. Dacy</u>, 301 Fed. App'x 45, 46 (2d Cir. 2008).  A court may also take into account a defendant's continued protestations of innocence at sentencing as a relevant factor counseling toward a higher sentence than the court might otherwise be inclined to impose.  <u>See, e.g.</u>, <u>United States v. Li</u>, 115 F.3d 125, 134-35 (2d Cir. 1997).

With regard to a defendant's allocution at sentencing, the First Amendment "does not erect a <u>per se</u> barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are

8

protected by the First Amendment." <u>Dawson v. Delaware</u>, 503 U.S. 159, 165 (1992). "A sentencing court may consider such evidence so long as it is relevant to the issues involved in the sentencing proceeding." <u>United States v. Kane</u>, 452 F.3d 140, 142 (2d Cir. 2006) (internal quotation marks omitted). A district court's consideration under 18 U.S.C. § 3553(a) of a defendant's public statement indicating a lack of remorse "does not violate [the defendant's] right to speak under First Amendment principles." <u>Stewart</u>, 686 F.3d at 167.

## III.   DISCUSSION

In support of his § 2255 petition, Cakoni has submitted 125 pages of briefing and a significant amount of additional supporting material. As Cakoni is now representing himself <u>pro se</u>, the Court will construe his papers favorably to state the strongest potentially relevant arguments they suggest, though the Court notes that Cakoni's briefing is not a model of either clarity or focus. Cakoni argues that his conviction and/or sentencing should be vacated, set aside, or corrected on nine separate grounds, which can be most easily summarized as ineffective assistance of counsel at trial, sentencing, and appeal, and the Court's violation of his First Amendment rights at sentencing. For the reasons that follow, all of Cakoni's claims lack merit, and accordingly his petition must be DENIED.

No evidentiary hearing is necessary in this action. The combined submissions of the parties provide a sufficient basis upon which to deny the petition, and the Court concludes that a full testimonial evidentiary hearing would not offer any reasonable chance of altering its view on the facts as alleged by Cakoni, including the details added in his petition. <u>See</u> <u>Chang v. United States</u>, 250 F.3d 79, 86 (2d

Cir. 2001) (court need not hold an evidentiary hearing where the combined submissions of the parties provide a sufficient basis to deny the petition).

A.   <u>Trial</u>

Most of Cakoni's arguments concern the performance of his counsel at trial, Winston Lee.  Specifically, Cakoni argues that Lee was ineffective because he: (1) failed to investigate and assemble exculpatory evidence; (2) failed to move to suppress statements Cakoni made to law enforcement; (3) failed to undermine Gjoka's testimony; (4) failed to object to the Government's violation of the Court's 404(b) ruling; (5) stipulated that Cakoni was incarcerated for prior offenses for certain periods of time; and (6) failed to seek a jury charge based on <u>Rosemond v. United States</u>, 134 S. Ct. 1240 (2014).  Cakoni also argues that even if Lee's decisions can be seen as reasonable when viewed individually, they nevertheless amount to ineffective assistance of counsel in the aggregate under the cumulative error doctrine.  None of these claims are availing.  The Court will address each in turn.

1.   <u>Investigation and Assembly of Exculpatory Evidence</u>

Cakoni argues that his trial counsel failed to investigate and assemble exculpatory evidence, specifically by failing to investigate the potential testimony of Jelena Kopravica or Hasan "Bobby" Gjekaj, failing to obtain supposedly exculpatory vehicle and phone records, and failing to investigate the results of NYPD/INS searches of Cakoni's and Gjoka's shared residence.

a)    Kopravica and Gjekaj.

Cakoni argues that Kopravica, who was Gjoka's girlfriend at the time, would testify that in or around October 2005 Gjoka was keeping firearms at her apartment and that Cakoni did not have access to them.  Cakoni believes that such testimony would exonerate him from the firearm charge against him, as in his view it completely contradicts Gjoka's testimony and exonerates Cakoni from the firearms charge.

Cakoni is mistaken for three reasons.  First, as a preliminary matter, it is unclear that Kopravica was actually willing to testify—although Cakoni has provided the Court with an "offer of proof" with respect to her, this was prepared by Cakoni, and not Kopravica or her representative.  (See Pet. ex. B.)  Second, the firearm charge was based on the Gjoka Crew's possession and use of firearms in June and July 2005.  As the proffered testimony by Kopravica concerns a time period months later, it would do nothing to help Cakoni rebut the evidence relating to the firearms charge.  Third, Lee and Cakoni discussed whether to attempt to call Kopravica, and ultimately decided not to due to a fear that "Kopravica would testify about her knowledge of a past assault by Mr. Cakoni, which would have been extremely prejudicial in light of the allegations in the indictment against Mr. Cakoni and the Government's assertions that Mr. Cakoni was the 'enforcer' of the charged conspiracy."  (Lee Decl. ¶ 6(b).)

With respect to Gjekaj, Cakoni argues that Lee should have called Gjekaj to testify that he ran a pizzeria that Cakoni worked in, and that he had no knowledge that Cakoni was selling marijuana or other drugs.  As with Kopravica, Cakoni is

mistaken as to Lee's decision not to call Gjekaj.  First, as a preliminary matter, there is no guarantee that Gjekaj would have waived his Fifth Amendment privileges to testify on Cakoni's behalf.  Second, Lee and Cakoni discussed whether to call Gjekaj, and decided not to because Gjekaj had previously been convicted of a state drug felony, which in Lee's view "would have seriously undercut his credibility and the defense's contention that any interaction by Mr. Cakoni with Mr. Gjekaj was not for purposes of distributing controlled substances."  (Lee Decl. ¶ 6(b).)  Third, and most importantly, the proffered testimony is not exculpatory or inconsistent with the testimony of other witnesses—it is wholly possible that Cakoni worked in a pizzeria under the auspices of an unsuspecting manager while dealing drugs on the side.

In sum, Lee's decisions not to call Kopravica or Gjekaj to testify did not fall below an objective standard of reasonableness, and in any event his failure to do so did not result in prejudice to Cakoni.

> b)      Vehicle impounding and jail telephone records.

Cakoni argues that Lee was ineffective because he failed to obtain vehicle impound records showing that Cakoni's Chrysler Pacifica was in an impound lot at the same time that, per Gjoka's testimony, Gjoka was driving it when he set up a call between himself, Gentian Cara and Cakoni regarding a marijuana deal.

Cakoni does not specify or provide any evidence of when the Pacifica was impounded, which is important because Gjoka only gave an approximate timeframe of "somewhere around September or October . . . 2007" for the marijuana deal.  (Tr. 626-28.)  It is therefore wholly unclear what work if any the impound records would

or could do to undermine Gjoka's testimony.  Indeed, Lee states that he and Cakoni discussed whether to attack Gjoka's testimony about his use of the Pacifica (though they did not discuss impound records specifically), and ultimately decided against it because it concerned only a minor potential inconsistency in Gjoka's testimony. (Lee Decl. ¶ 6(d).)

Cakoni also argues that Lee was ineffective because he failed to obtain jail phone records that would discredit Gjoka's testimony that he put Gentian Cara on the phone with Cakoni after Cara was released from prison, around the time of that 2007 marijuana deal.  According to Cakoni, both he and Cara were incarcerated at the time, and jail phone records would have shown that no such phone call took place, thereby eviscerating Gjoka's credibility as a witness.

Cara was released from federal prison on March 16, 2007 and not re-admitted until August 6, 2010.  (Declaration of Michael D. Maimin ("Maimin Decl.") ex. C.) Cakoni was in immigration custody from May 23, 2007 through November 5, 2007. (Tr. 600.)  Therefore, it is possible that both Cakoni and Cara were, in fact, incarcerated at the time of that marijuana deal, particularly if the deal occurred in September or October 2007, as Gjoka testified.

However, Lee investigated whether he could obtain the jail phone records, and he discovered that records no longer existed for any prisoner held at the subject jail prior to April 2009.  (Lee Decl. ¶ 6(e).)  Indeed, at Cara's counsel's request, the Government issued trial subpoenas seeking Cara's prison recordings from the two detention facilities at which he was incarcerated at various periods from 2004 to

2007, and received negative responses from both facilities.  (Maimin Decl. ex. D.)
The parties subsequently stipulated that the recordings were not available.  (Tr.
899.)

Further, as stated above, Gjoka provided only a rough timeframe for when
the deal occurred, and so even if the recordings were available, they were likely of
only limited value (if any) in impeaching Gjoka.  Lee's failure to obtain the
telephone records is therefore must likely explained as a result of the fact that those
records do not exist; and even if they did exist, his failure to obtain them would not
have so prejudiced Cakoni as to likely have altered the result of his trial.

Thus, that Lee did not use vehicle impound records or jail telephone records
to impeach Gjoka did not amount to ineffective assistance of counsel, as Lee's
decisions with respect to these issues were reasonable, and in any event it is not
reasonably probable that but for his decision to do so, the result of the proceeding
would have been different.  See Dupont v. United States, 224 Fed. App'x 80, 82 (2d
Cir. 2007) (reasonable tactical decisions "do[] not constitute deficient performance if,
as is typically the case, the lawyer has a reasonable justification for the decision."
(internal quotation mark omitted) (quoting Greiner v. Wells, 417 F.3d 305, 319 (2d
Cir. 2005))).

c)      NYPD/INS search results.

Cakoni argues that Lee was ineffective because he failed to investigate the
results of New York City Police Department ("NYPD") and Immigration and
Naturalization Service ("INS") searches of his and Gjoka's shared residence that
Cakoni claims to have occurred in September or October 2006 and on May 23, 2007,

which Cakoni believes would have shown that the shared residence was not a marijuana trafficking hub.  But there is no evidence (beyond Cakoni's say-so) that such searches occurred.  Even if they did occur, Gjoka did not testify that his and Cakoni's shared apartment was a hub of marijuana trafficking—rather, he testified that sometime around late 2006 or early 2007, there was marijuana in their residence at a specific point in time, when Cakoni and two other individuals were cutting it, weighing it, and putting it into bags.  (See Tr. 632-34.)  Evidence that there was not marijuana in the apartment when it was searched in September or October 2006 or on May 23, 2007 is not necessarily inconsistent with this testimony, for which no specific date is provided—it is possible both that Cakoni briefly had marijuana in the apartment, and that marijuana was not in the apartment at the time it was searched.  Lee also states that Cakoni never asked him to obtain such INS/NYPD records.  (Lee Decl. ¶ 6(d).)

Lee's failure to investigate such search results is reasonable in light of the fact that he was not alerted to their potential existence.  In any event, the search results would have been of little impeachment value, and so Lee's failure to obtain them would not have prejudiced Cakoni, as there is no reasonable probability that but for Lee's failure to obtain them the result of the proceeding would have been different.  Lee therefore was not constitutionally ineffective in this regard.

### 2.   Motion to Suppress Cakoni's Statements to Law Enforcement

Cakoni argues that Lee should have moved to suppress statements he made to law enforcement officials during two interviews about the murder of Erion Shehu, who was known as "Lonka," and an interview about Gjoka's whereabouts.

15

Cakoni now argues that he was in custody during the first two interviews, and that the law enforcement officials in question violated his <u>Miranda</u> rights by questioning him.  Thus, says Cakoni, these statements were unconstitutionally used against him at trial.

What Cakoni ignores is that at trial, Cakoni's counsel actually used these interviews to his advantage, comparing his willingness to talk to the police to the actions of other alleged co-conspirators.  (<u>See</u> Tr. 1603-05.)  Indeed, Lee appears to have done so at Cakoni's urging: Cakoni and Lee discussed whether they should move to suppress these statements, and Cakoni insisted that they not do so because he "wanted the jury to know that he truthfully and freely spoke to the authorities at all times and thereby conclude that he did so because he had nothing to hide and was innocent of the charges."  (Lee Decl. ¶ 7(b).)  Lee's decision to not to suppress these statements and to use them in this manner was both strategic and reasonable, and therefore cannot serve as the basis for an ineffective assistance of counsel claim.

Further, there is also no merit to Cakoni's argument that Lee could have both moved to suppress the statements but still included in his defense the fact that Cakoni voluntarily met with law enforcement on three occasions.  The mere fact that he met with law enforcement, devoid of context regarding why he did so and what he said during the meetings, is not probative of his guilt or innocence, as it could suggest to the jury that that there were good reasons to suspect that Cakoni

was involved in the murder, which would no doubt prejudice him rather than aid in exculpating him from the crimes charged.

### 3.   Undermining of Gjoka's Testimony

Cakoni argues that Lee provided ineffective assistance in connection with testimony by Gjoka, who served as a cooperating witness at trial, in several ways: (1) by failing to call law enforcement agents to impeach Gjoka with prior inconsistent statements he made at proffer sessions; (2) failing to object to the admission of Gjoka's redacted cooperation agreement, which did not disclose that Gjoka's family was moved to the United State due to concerns they would be retaliated against for Gjoka's testimony; and (3) failing to demand a psychological evaluation of Gjoka.  Each of these arguments lacks merit.

With regard to impeachment, Lee agreed with the Government not to call certain law enforcement agents to impeach Gjoka, but he did so on the sound rationale that it would not be wise to call an impeachment witness from whom damaging testimony concerning Gjoka's prior consistent statements and the evolution of his narrative and statements over the course of many proffer sessions could be elicited by the Government.  (See Lee Decl. ¶ 8(c).)  Further, Cakoni's co-defendant's trial counsel engaged in extensive and aggressive cross-examination of Gjoka, during which Gjoka admitted to, inter alia, putting explosives in his clothing and threatening to blow up a restaurant (Tr. 751-52), having been involved in multiple violent fights (see Tr. 752), and lying on his visa application (Tr. 754-55). Lee's decision not to call law enforcement agents to impeach Gjoka was reasonable under the circumstances.

Lee's decision was also reasonable with regard to the admission of the redacted cooperation agreement.  The cooperation agreement itself evidenced the benefits that Gjoka expected to receive in exchange for his testimony, which in turn raised a possible inference that he would be motivated to provide false or incomplete testimony favorable to the Government.  And the redaction of the reference to the Witness Protection Program and the moving of Gjoka's family to the United States was intended to prevent the jury from drawing an inference that Cakoni might arrange for violent retaliation against Gjoka's family due to Gjoka's decision to testify against Cakoni.  (See Lee Decl. ¶ 9(b).)

As to Lee's alleged failure to demand a psychological evaluation of Gjoka, there is no evidence that Lee had or should have had a good faith basis for believing that Gjoka would be incapable of testifying competently, so as to warrant a psychiatric evaluation.  In support of his argument, Cakoni points to several statements that Gjoka made in a novel he wrote.  But an author's statements in a work of fiction are hardly a sound basis for inferring that the author would be incapable of testifying in a competent manner—some evidence from the real world is needed.  Further, Lee "believed that evidence of Mr. Gjoka's emotional instability or immaturity would be useful to the defense for purposes of undermining the credibility and reliability of his testimony." (Lee Decl. ¶ 10(b).)  In any event, the case against Cakoni rested on much more than Gjoka's testimony alone—it also included incriminating testimony by Neritan Kocareli, Almir Rrapo, and several law

enforcement agents, as well as phone and border crossing records. (See Tr. 1229-31, 1429, 1437-39, 1485-93, 1515-19.)

In sum, Lee's decisions with regard to the best way to undermine Gjoka were reasonable, and in any event following the paths now argued for by Cakoni would not have been reasonably likely to have altered the result of the trial. Accordingly, Lee was not constitutionally ineffective with regard to his examination of Gjoka.

### 4.   Objection to Court's Rule 404(b) Ruling

Cakoni argues that Lee provided ineffective assistance by failing to object to the scope of the Government's case-in-chief as exceeding the bounds of the Court's Rule 404(b) ruling. However, Cakoni previously raised the underlying substance of this argument on appeal, arguing that the Government's case was so broad in scope as to constitute a prejudicial variance or constructive amendment of the firearms charge against him, and that the pretrial ruling was the result of prosecutorial misconduct. (See Pro Se App. Br. at 35-52.) The Second Circuit has already rejected these arguments, see Sejdaris, 534 Fed. App'x at 24-25, and they cannot be recast as ineffective assistance arguments and relitigated via a § 2255 petition in the absence of an intervening change in the law, see Yick Man Mui, 614 F.3d at 55.

### 5.   Stipulation to Incarceration at Certain Times

Before trial, the parties stipulated that Cakoni was incarcerated from May 25, 2004, through June 28, 2004; from January 6, 2006, through June 6, 2006; and from May 23, 2007, through November 5, 2007; and in New York State correctional facilities from June 19, 2002, through November 25, 2003. (Tr. 600-01). Cakoni argues that Lee by doing so, Lee provided ineffective assistance of counsel.

However, Lee used this stipulation to impeach Gjoka, getting him to admit that he was "not good with years."  (Tr. 820-23, 1584-86.)

Cakoni now argues that Lee should have stipulated only to Cakoni's incarceration in 2002 and 2003, and that his stipulation to the other dates of incarceration prejudiced him.  The stipulation was a negotiated agreement between Cakoni and the Government; its mention of some dates of incarceration helpful to Cakoni, and some that are not, is the result of a compromise reasonably reached by Cakoni's counsel in the hopes that the benefits would outweigh the costs.  Lee did not provide ineffective assistance of counsel in so stipulating.

### 6.    Jury Charge Based on Rosemond v. United States

Cakoni argues that Lee should have objected to an aiding-and-abetting instruction because it did not incorporate the law as stated in Rosemond v. United States, 134 S. Ct. 1240 (2014), which the Supreme Court decided about three years after Cakoni's trial, and that Lee's failure to do so constitutes ineffective assistance of counsel.  First, "[c]ounsel is not required to forecast changes in the governing law."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).  Lee's failure to seek a jury instruction based on a case that would be not be decided until several years into the future was certainly reasonable.[4]

---

[4] The Court further notes that a new rule of constitutional law "is not made retroactive to cases on collateral review unless the Supreme Court holds it to be retroactive," Tyler v. Cain, 533 U.S. 656, 663 (2001) (internal quotation marks omitted), and the Supreme Court did not hold the rule announced in Rosemond to be retroactive, see 134 S. Ct. 1240.

7.   <u>Cumulative Error Doctrine</u>

Cakoni argues that Lee's decisions at trial amount to ineffective assistance of counsel in the aggregate.  It is, of course, possible for the cumulative effect of several errors by trial counsel to amount to ineffective assistance of counsel warranting habeas relief.  <u>See</u> <u>Lindstadt v. Keane</u>, 239 F.3d 191, 204 (2d Cir. 2001). Nevertheless, as established above, each of Lee's decisions was reasonable, and they did not come together, as Cakoni suggests, to cause death by a thousand cuts at trial.  Cakoni was not convicted because his trial counsel made a large number of errors that seem inconsequential in isolation—his counsel made a number of reasonable decisions, some of which aided Cakoni, and some of which may not have paid off the way he or Cakoni would have liked them to.  Ultimately, all of Lee's claims of ineffective assistance of counsel at trial lack merit.

B.   <u>Sentencing</u>

Cakoni argues that this Court infringed on his First Amendment rights when it factored in his lack of remorse in his sentencing, and that his sentencing counsel was ineffective for failing to object to his sentence on First Amendment grounds. These arguments are baseless as a matter of law, as it is well established that a court's consideration under 18 U.S.C. § 3553(a) of a statement by a defendant indicating a lack of remorse "does not violate [the defendant's] right to speak under First Amendment principles."  <u>Stewart</u>, 686 F.3d at 167.  In any event the Second Circuit stated that the Court was "well within [its] discretion in considering . . . Cakoni's protestations of innocence to be an indication of likely recidivism" and "reasonably interpreted" the remarks "as lies."  <u>Sejdaris</u>, 534 Fed. App'x at 25.

21

C.    <u>Appeal</u>

Cakoni argues that his appellate counsel was ineffective at oral argument for not raising his arguments from his <u>pro se</u> appellate brief, particularly his argument concerning constructing amendment.  However, even though Cakoni's arguments were not discussed at oral argument, they were explicitly considered and rejected by the Second Circuit.  <u>See</u> <u>Sejdaris</u>, 534 Fed. App'x at 24-25.  There is no reason to believe that if only appellate counsel had been more persuasive, the Second Circuit would have come to a different conclusion.  Accordingly, Cakoni's appellate counsel was not ineffective—indeed, Cakoni's appellate counsel reasonably chose to focus at oral argument on Cakoni's strongest arguments and those the Second Circuit was most interested in addressing.

IV.    CONCLUSION

For the reasons set forth above, Cakoni's petition to vacate, set aside, or correct his sentence is DENIED.  The Court further declines to issue a certificate of appealability, as Cakoni has not made a substantial showing of a denial of a federal right.  <u>See</u> <u>Matthews v. United States</u>, 682 F.3d 180, 185 (2d Cir.2012).

The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated:        New York, New York
              April 15, 2015

_____

KATHERINE B. FORREST
United States District Judge

Copy to:

Skender Cakoni
36580054
Federal Correctional Institution Elkton
P.O. Box 10
Lisbon, OH 44432